**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE** | § | **CASE NO. 15-34287** |
| | § | |
| **BLACK ELK ENERGY** | § | |
| **OFFSHORE OPERATIONS, LLC** | § | |
| **DEBTOR** | § | **CHAPTER 11** |

---

| | | |
|---|---|---|
| **ARGONAUT INSURANCE** | § | |
| **COMPANY** | § | |
| | § | |
| **v.** | § | **CASE NO. 15-34287** |
| | § | |
| **PLATINUM PARTNERS VALUE** | § | **CHAPTER 11** |
| **ARBITRAGE FUND, LP and** | § | |
| **TKN PETROLEUM OFFSHORE, LLC** | § | **ADVERSARY NO. 15-03335** |

### ARGONAUT'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR TO COMPEL ARBITRATION (DOCKET NO. 13)

Argonaut Insurance Company ("Argonaut") submits this memorandum in opposition to the motion to dismiss or to compel arbitration filed by Platinum Partners Value Arbitrage Fund, LP ("Platinum") and TKN Petroleum Offshore, LLC ("TKN") (collectively, the "Defendants"). The motion should be denied in all respects for the reasons provided below.

### BACKGROUND

1.     <u>The Indemnity Agreements in Favor of Argonaut</u>

This case involves the Defendants' breach of their clear contractual obligation to fully collateralize decommissioning bonds issued by Argonaut, as surety for the debtor, Black Elk Energy Offshore Operations, LLC ("Black Elk"), in favor of the U.S. Department of the Interior, the Bureau of Ocean Energy Management, and various predecessors-in-interest and other third parties (the "Bonds"). The Bonds were issued between 2009 and 2015 to secure Black Elk's

performance of plugging and abandonment obligations arising from its operations on the Outer Continental Shelf.[1]

In consideration for Argonaut's procurement of the Bonds, Black Elk and Platinum, as the original "Indemnitors," entered into a General Indemnity Agreement dated December 11, 2009 (the "Original GIA") to protect Argonaut, as surety, from incurring any "Losses" in connection with the Bonds.[2]  Through a separate General Indemnity Agreement dated May 11, 2015 (the "Platinum/TKN Specific GIA"),[3] Platinum and TKN also agreed to be "Indemnitors" with respect to the Bonds and further agreed to assume Black Elk's obligations as indemnitor under the Original GIA.[4]

The Defendants executed the Platinum/TKN Specific GIA "for the benefit of Argonaut" as an "inducement to the Surety and in consideration of the Surety's execution or procurement of the Bond(s), the Surety's refraining from cancelling one or more Bond(s), and/or the Surety's assumption of one or more Bond(s) . . . ."[5]   Consistent with the purpose of the agreement, the Platinum/TKN Specific GIA, like the Original GIA, is designed to broadly protect Argonaut from any "Losses" incurred in connection with the Bonds and does not include any affirmative obligations on the part of Argonaut.[6]  The Platinum/TKN Specific GIA calls for the application of Texas law and includes no arbitration provisions.[7]

---

[1] *See* Original Complaint by Argonaut Insurance Company (R. Doc. 1) (the "Complaint"), para. 4.

[2] The Original GIA is attached hereto as Exhibit A.

[3] The Platinum/TKN Specific GIA (referred to by the Defendants as the "Texas Indemnity Agreement") is exhibit A to the Complaint.  For the Court's benefit, the Platinum/TKN Specific GIA is also attached hereto as Exhibit B.

[4] Exhibit B, pp. 1, 3-4.

[5] Exhibit B, p. 1.

[6] Exhibit B, para. 2.

[7] Exhibit B, para. 23.

2

To further mitigate Argonaut's risk under the Bonds, the Platinum/TKN Specific GIA allows Argonaut, under appropriate circumstances, to demand that the Defendants procure a release of the Bonds or be forced to provide additional collateral.  Specifically, the agreement authorizes Argonaut, "in its sole discretion," to determine whether:

    (a)      the Indemnitors financial condition has been or is believed to be deteriorating; or

    (b)      there has been or is believed to be some other change that adversely impacts [Argonaut's] risk under the Bond(s).[8]

In either case, the Defendants agreed that, within thirty days of receiving written demand from Argonaut, they would "procure the full and complete release of the Bond(s)."[9]  The Defendants further agreed that, if they failed to procure a release of the Bonds, they would provide Argonaut with collateral "in the amount of 100% of all unreleased liability under the Bond(s)."[10]

On the same day that they executed the Platinum/TKN Specific GIA, the Defendants separately executed a "Cayman Islands" version (Platinum is a Cayman Islands company) of the same agreement (the "Cayman Islands GIA").[11]  Like the Platinum/TKN Specific GIA, the Cayman Islands GIA was entered into by Defendants "for the benefit of Argonaut" and includes no affirmative obligations on behalf of Argonaut.[12]  The Cayman Islands GIA also includes the same substantive protections provided to Argonaut under the Platinum/TKN Specific GIA.  Unlike the Platinum/TKN Specific GIA, the Cayman Island GIA calls for the application of New York

---

[8] Exhibit B, para. 11.

[9] Exhibit B, para. 11.

[10] Exhibit B, para. 11.  The Defendants also agreed to "waive, to the fullest extent permitted by law, each and every right that they may have to contest this requirement to provide collateral under this Agreement . . . ."  Exhibit B, para. 11.

[11] The Cayman Islands GIA (referred to by the Defendants as the "New York Indemnity Agreement") was attached to the Defendants' motion as exhibit A.  The Cayman Islands GIA is also attached hereto as <u>Exhibit C</u>.

[12] *See* Exhibit C.

law and includes an express agreement <u>by the Defendants</u> to arbitrate in the United States (in New York) if any dispute were to arise between Argonaut and the Defendants.[13]

2.      **The Black Elk Bankruptcy and Argonaut's Enforcement of its Rights under the Platinum/TKN Specific GIA**

Black Elk was placed into involuntary Chapter 7 bankruptcy on August 11, 2015.[14] Shortly thereafter, Argonaut sent demand letters to Platinum and TKN pursuant to the express terms of the Platinum/TKN Specific GIA.  Consistent with its rights under that agreement, Argonaut demanded a release of the Bonds and advised that, if the Bonds were not released, the Defendants would be obligated to fully collateralize the Bonds.[15]  In addition to demanding this collateral from the Defendants, Argonaut separately filed a proof of claim against the estate for the uncollateralized portion of the Bonds.[16]

Neither Platinum nor TKN responded to the demand letters, and both failed to provide a release of the Bonds or the required collateral.[17]  As a result, Argonaut filed a complaint in this adversary proceeding to enforce its rights under the Platinum/TKN Specific GIA.  In its complaint, Argonaut did not seek any relief under the Cayman Islands GIA.

---

[13] Exhibit C, para. 23.

[14] The bankruptcy has since been converted to Chapter 11.

[15] *See* Complaint, paras. 5, 6, and 9.

[16] *See* Claim No. 213 filed by Argonaut in the bankruptcy on January 15, 2016.

[17] *See* Complaint, para. 10.

## LAW AND ARGUMENT

1. <u>**The Court has jurisdiction over this proceeding because it is related to the underlying bankruptcy.**</u>

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1334(b) because it is "related to" the underlying bankruptcy. "Related to" jurisdiction is the "broadest of the potential paths to bankruptcy jurisdiction . . . ."[18] In the Fifth Circuit, the standard for "related to" jurisdiction is expansive and includes any action that could have a "*conceivable* effect" on the bankruptcy estate.[19] Even proceedings that "portend[] a mere contingent or tangential effect on a debtor's estate" meet the broad jurisdictional test for "related to" jurisdiction.[20] Moreover, a bankruptcy court's "related to" jurisdiction is even broader in Chapter 11 reorganizations than it is in Chapter 7 liquidations.[21]

This adversary proceeding is closely related to the underlying bankruptcy, and its outcome will have a meaningful impact on the bankruptcy estate. As the Court is aware, the funding of Black Elk's unfulfilled decommissioning obligations is a driving force in the bankruptcy. The Department of the Interior has asserted a priority claim in the amount of $660,606,223 reflecting its valuation of Black Elk's outstanding decommissioning liability, and the estate's ability to independently fund the necessary decommissioning activities is presently non-existent.[22] If the Defendants are forced to abide by their contractual obligation to fully collateralize the Bonds,

---

[18] *In re Resorts Intern., Inc.*, 372 F.3d 154, 163 (3d Cir. 2004).

[19] *In re Canion,* 196 F.3d 579, 585 (5th Cir. 1999) (emphasis in original); *see also In re Wood*, 825 F.2d 90, 94 (5th Cir. 1987) ("Although we acknowledge the possibility that this suit may ultimately have no effect on the bankruptcy, we cannot conclude, on the facts before us, that it will have no *conceivable* effect.") (emphasis in original); *Copelin v. Spirco, Inc.*, 182 F.3d 174, 179 (3d Cir. 1999) ("[T]he key word is 'conceivable.' Certainty, or even likelihood [of effect on the estate being administered in bankruptcy] is not a requirement.") (citation omitted; alteration in original).

[20] *In re Titan Energy,* 837 F.2d 325, 330 (8th Cir. 1988) (cited with approval by *In re Canion*, 196 F.3d at 585, n.30).

[21] *Celotex Corp. v. Edwards*, 514 U.S. 300, 310 (1995).

[22] *See* Claim No. 102 filed by the Department of the Interior in the bankruptcy on January 8, 2016.

substantial additional collateral will be available to deploy specifically towards decommissioning activities. Therefore, Argonaut's claims against the Defendants are directly tied to the bankruptcy case because the collateral Argonaut seeks in this adversary proceeding will be used to secure, and eventually fulfill, the performance of Black Elk's extensive decommissioning obligations.

In addition, the outcome of this proceeding will have a direct impact on Argonaut's claim against Black Elk in the underlying bankruptcy for payment of the uncollateralized portion of the Bonds.[23] Through this adversary proceeding, Argonaut seeks to recover these <u>same amounts</u> from the Defendants, who are jointly and severally liable with Black Elk for providing collateral "in the amount of 100% of all unreleased liability under the Bond(s)."[24] When the Defendants have satisfied this obligation (through judgment, court order, or otherwise), Argonaut's claim against Black Elk will be diminished accordingly, resulting in additional assets being made available for distribution to Black Elk's other creditors. Thus, the outcome of this case will not just have a "conceivable effect" on the bankruptcy – it will substantially impact all interested parties.

The Fifth Circuit and this Court have repeatedly recognized that "related to" jurisdiction exists when a plaintiff's claims against a non-debtor could result in a reduction of the plaintiff's

---

[23] *See* Claim No. 213 filed by Argonaut in the bankruptcy on January 15, 2016.

[24] *See* Platinum/TKN Specific GIA and Original GIA (both providing that "the Indemnitors hereby agree . . . jointly and severally, as follows . . . .").

claim against the estate.[25]  For instance, in *In re TXNB Internal Case*, the Fifth Circuit exercised

"related to" jurisdiction over a dispute against a non-debtor defendant that, if successful, would

potentially "discharge[] a liability of the debtors."[26]  There, the plaintiff was a natural gas producer

that sold gas to the debtors, who in turn sold the gas to the defendant.[27]  The debtors failed to pay

the plaintiff and subsequently filed for bankruptcy.[28]  The plaintiff filed a lawsuit against the non-

debtor defendant, who then removed the case to bankruptcy court.[29]  The Fifth Circuit held that

removal was appropriate because the plaintiff's claims "related to" the debtors' estate.[30]  In its

reasoning, the court noted that:

> Someone owes [the plaintiff] money for the gas; if it is not [the
> defendant], it is the debtors.  If it is [the defendant], then [the
> defendant] will have discharged a liability of the debtors . . . .[31]

The court even recognized that the defendant, if liable, would likely file a claim against the debtors'

estate for the judgment amount, effectively resulting in a mere replacement of "the identity of the

party that the debtors owe" without any "change in the amount of liability claimed against the

---

[25] *See, e.g.*, *In re Spillman Development Group, Ltd.*, 710 F.3d 299, 305 (5th Cir. 2013) ("If [plaintiff] were to succeed on the merits of this suit and proceed to recover against the [defendants], such a recovery would presumably diminish [plaintiff's] deficiency claim against the bankruptcy estate, conceivably allowing a greater recovery for the other unsecured creditors against the estate."); *In re Stonebridge Technologies*, 430 F.3d 260, 266-67 (5th Cir. 2005) (holding that "related to" jurisdiction existed over claims against a non-debtor where the outcome could effect "the need [for a third party] to seek reimbursement from [the] bankruptcy estate."); *In re Hidalgo Logistics*, No. 13-70239, 2014 WL 2003216, at *9 (Bankr. S.D. Tex. May 15, 2014) (holding that "related to" jurisdiction existed over a breach of contract claim between non-debtors where the plaintiff alleged that the defendants and debtor were jointly and severally liable and the resolution of that claim could eliminate or reduce the plaintiff's claim against the bankruptcy estate); *see also In re Wood*, 825 F.2d at 94 (holding that "related to" jurisdiction existed when the plaintiff alleged liability resulting from the joint conduct of the debtor and non-debtor); *In re DeLape*, No. 13-34114, 2014 WL 4748735, at *2-3 (Bankr. S.D. Tex. Sept. 24, 2014) (same).

[26] 483 F.3d 292, 298 (5th Cir. 2007).

[27] *Id.* at 296.

[28] *Id.* at 296-97.

[29] *Id.*

[30] *Id.* at 299.

[31] *Id.* at 298 (citation omitted).

debtors."[32]   The court, nevertheless, *still* found that this was sufficient to confer "related to" jurisdiction.[33]

Similarly here, someone owes Argonaut collateral for Black Elk's decommissioning obligations; if it is not the defendants, then it is Black Elk.  If the Court orders the Defendants to provide the collateral, then Argonaut's claims against Black Elk's estate for additional collateral will be diminished, which will enable greater recovery for other creditors.[34]

Tellingly, in many of the cases cited by the Defendants, the courts actually concluded that "related to" jurisdiction existed.[35]   And the *Courtney* case discussed by the Defendants (a 2005 memorandum opinion out of Missouri) is not only distinguishable but is also inconsistent with controlling Fifth Circuit precedent.[36]   The plaintiff in that case was not seeking payment from a non-debtor *in lieu* of the debtor; rather, the court was asked to "interpret the language contained in [two] letters of credit" and "determin[e] . . . the validity and extent of the debt."[37]   There was no indication that the actual relief sought by the plaintiff would have any impact on the bankruptcy estate.  Here, by contrast, the outcome of this case will have a direct impact on the bankruptcy estate by reducing Argonaut's claim and making additional collateral available to satisfy the estate's substantial remaining decommissioning obligations.  Additionally, contrary to the holding of the *Courtney* case, the Fifth Circuit recognized in the *In re TXNB* case discussed above that a

---

[32] *Id.*

[33] *Id.*

[34] *See In re Spillman Development Group, Ltd.*, 710 F.3d at 305.

[35] *See* Defendants' motion, pp. 3-4 (citing *id.* at 304; *In re DeLape*, 2014 WL 4748735, at *1; *Matter of Majestic Energy Corp.*, 835 F.2d 87, 90 (5th Cir. 1988); *In re Riverside Nursing Home*, 144 B.R. 951, 955 (S.D.N.Y. 1992)). In each of these cases, the court found that "related to" jurisdiction existed.

[36] *In re Courtney Excavating & Const., Inc.*, 325 B.R. 839, 842 (Bankr. W.D. Mo. 2005).

[37] *Id.* at 841-42.

mere replacement of "the identity of the party that the debtors owe" can be sufficient to confer "related to" jurisdiction.[38]

For these reasons, Argonaut's claims in this case will have a "conceivable effect" on the debtor's estate and are, therefore, related to the underlying bankruptcy. The Defendants' motion to dismiss for lack of subject-matter jurisdiction should be denied.

**2.     Argonaut has no obligation to pursue arbitration to enforce its rights against the Defendants.**

"[A] party who has not agreed to arbitration has a right to have disputes resolved by litigation."[39] A court cannot force arbitration absent a "contractual right to compel [a party] to arbitrate [its] claims."[40] The party seeking to compel arbitration must establish that there is a valid arbitration agreement and that the claims raised fall within that agreement's scope.[41]

Here, the Defendants have no contractual right to compel Argonaut to arbitrate this dispute. Argonaut's claims in this case arise under the Platinum/TKN Specific GIA, which unquestionably does not include any language requiring either party to arbitrate. Additionally, for the reasons discussed below, the Court cannot rely on an agreement that is not the subject to this lawsuit (the

---

[38] 483 F.3d at 298.

[39] *Rich v. Cantilo & Bennett, LLP*, No. 03-15-00408, 2016 WL 611804, at *2 (Tex.App.—Austin Feb. 9, 2016) (citing *Freis v. Canales*, 877 S.W.2d 283, 284 (Tex. 1994)) (Texas law); *see also Jenkens & Gilchrist v. Riggs*, 87 S.W.3d 198, 201 (Tex.App.—Dallas 2002) (recognizing that arbitration is "a contractual matter and, in the absence of an agreement to arbitrate, a party cannot be forced to forfeit the constitutional protections of the judicial system and submit its dispute to arbitration.") (Texas law); *State Farm Mut. Auto. Ins. Co. v. Torcivia*, , 76 (N.Y. App. Div. 2d Dept. 2000) ("A party will not be compelled to arbitrate, and thus surrender the right to litigate a dispute in court, absent evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes . . . .") (New York law).

[40] *Freis*, 877 S.W.2d at 284 (Texas law); *Haviland v. Goldman, Sachs & Co*., 947 F.2d 601, 604 (2d Cir. 1991) (emphasizing that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (citation and internal quotation marks omitted) (New York law).

[41] *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (Texas law)*; Speedemissions, Inc. v. Bear Gate, L.P.*, 404 S.W.3d 34, 41 (Tex.App.—Houston [1st Dist.] 2013) (Texas law); *Rosen v. Mega Bloks Inc.*, No. 06-3474, 2007 WL 1958968, at *4 (S.D.N.Y. July 6, 2007) (New York law); *Snyder v. Wells Fargo Bank*, No. 11-4496, 2011 WL 6382707, at *3 (S.D.N.Y. Dec. 19, 2011) (New York law).

Cayman Islands GIA) to determine whether Argonaut agreed to arbitrate a dispute under the actual contract at issue (the Platinum/TKN Specific GIA).  Even if the Cayman Islands GIA did apply, there is no provision in that agreement, which was executed "for the benefit of Argonaut," to indicate that Argonaut agreed to forego its right to enforce the agreement through litigation.

> a.   The arbitrability of this dispute should be determined within the four corners of the Platinum/TKN Specific GIA.

The Defendants cannot rely on an arbitration provision in the Cayman Islands GIA to force arbitration of a dispute under the Platinum/TKN Specific GIA, which does not contain any arbitration language.   A dispute falls outside the scope of an arbitration agreement "if the action could be maintained without reference to the contract or relationship at issue."[42]   Under New York law,[43] a broad arbitration provision will not cover claims arising under a "related but distinct" contract where the two contracts are not integral to one another and the claims arising under each contract can be pursued independently.[44]   Likewise, under Texas law, "[a] claim is not subject to arbitration if the facts alleged in support of the claim stand alone, are completely independent of the contract, and the claim could be maintained without reference to the contract."[45]   Although courts may construe two separate agreements together, "[r]eading and construing contracts

---

[42] *Delta Associates v. Am. Dental Partners of Michigan*, 520 Fed.Appx. 349, 351 (6th Cir. 2013) (citation and internal quotation marks omitted).

[43] The Defendants' arguments in favor of arbitration are based on an agreement that calls for the application of New York law.  New York law, therefore, applies for purposes of determining the appropriate scope of that agreement. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) ("Whether or not the parties have agreed to arbitrate is a question of state contract law.").  Because Texas law is generally consistent with New York law on these issues, citations to cases from both states are included in this memorandum.

[44] *Snyder*, 2011 WL 6382707, at *4 ("[J]ust because the IRA agreement contains a broad arbitration clause, does not mean that Snyder can be forced to arbitrate claims arising out of a related but distinct contract.").

[45] *Endura Advisory Grp., Ltd. v. Altomare*, No. 04-14-00889, 2015 WL 1639632, at *3 (Tex.App.—San Antonio Apr. 8, 2015).

together does not justify bodily taking a paragraph from one contract and transplanting it in the other."[46]

Here, the Platinum/TKN Specific GIA and the Cayman Islands GIA are separate contracts, and this lawsuit can be maintained without reference to the Cayman Islands GIA.   The Defendants cannot simply take an arbitration provision from one agreement and "transplant" it into the contract at issue in this case.   Argonaut was within its discretion to enforce its rights under the Platinum/TKN Specific GIA, and it should not be required to arbitrate under a completely separate agreement.[47]

The fact that the Cayman Islands GIA includes a "broad" arbitration provision does not compel a different result.   In *Snyder v. Wells Fargo Bank*, for instance, a New York court refused to apply an arbitration clause pulled from a separate contract, even though that contract included a "broad" arbitration clause.[48]   The parties in that case contemporaneously entered into two related contracts, embodied by separate documents.[49]   One contract contained a "broad" arbitration clause, while the other contained no arbitration agreement.[50]   Like the Defendants here, the proponents of arbitration in *Snyder* argued that "under broad arbitration clauses, courts must compel arbitration

---

[46] *A.J. Robbins & Co. v. Roberts*, 610 S.W.2d 854, 857 (Tex.App.—Amarillo 1980) (quoting *Govt. Personnel Mut. Life Ins. Co. v. Wear*, 247 S.W.2d 284, 286 (Tex.App.—San Antonio 1952), *modified on other grounds*, 251 S.W.2d 525 (Tex. 1952)); *see also Rosen*, 2007 WL 1958968, at *4-5 (recognizing that the fact that two contracts are executed contemporaneously does not necessarily mean "that those instruments constitute one contract or that one contract was accordingly merged in or unified with another so that every provision in one becomes part of every other . . . .") (quoting 11 Williston on Contracts § 30:26 (4th ed.)).

[47] *See The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("[T]he party who brings a suit is master to decide what law he will rely upon . . . ."); *Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 366 (5th Cir. 1995) ("The plaintiff . . . is master of her complaint").

[48] 2011 WL 6382707.

[49] *Id.*

[50] *Id.* at *4.

11

in cases if the allegations underlying the claims touch matters covered by the parties' agreement."[51]
The court rejected this argument, noting that "this rule . . . has not been held to include claims
arising from a distinct contract not providing for arbitration."[52]

The *Snyder* court further explained that a broad arbitration provision will not cover claims
arising under a separate contract where the contracts are not integral to one another and the claims
arising under each contract can be pursued independently.[53]  Moreover, according to the court, the
absence of an arbitration provision in one contract indicated that the parties did not intend to
arbitrate under both contracts: "the omission of an arbitration clause in an otherwise comparable
document strongly suggests that such omission was intentional."[54]  The court ultimately concluded
that, "while multiple documents executed at the same time and concerning the same subject-matter
are required to be read together under New York law, this does not mean that arbitration clauses—
or any other particularized clauses—can be lifted from one document and transferred to another."[55]

A Texas court reached a similar result in *Speedemissions, Inc. v. Bear Gates, L.P.*  Like
*Snyder*, that case involved a broad arbitration provision, which stated that "[a]ny controversy or
claim arising out of or relating to this Agreement or <u>any related agreement</u> shall be settled by
arbitration . . . ."[56]  Despite this broad language, the court refused to apply the provision to a dispute

---

[51] *Id.* (internal quotation marks and bracket omitted).

[52] *Id.*

[53] *Id.*

[54] *Id.* at *5.

[55] *Id.* (citing *Teletech Europe B.V. v. Essar Services Mauritius*, 921 N.Y.S.2d 62 (N.Y. App. Div. 1st Dept. 2011)
(refusing to transpose an arbitration clause from a stock transfer agreement to an escrow agreement); *Smith v. Shields
Sales Corp.,* 802 N.Y.S.2d 764, 765 (N.Y. App. Div. 3d Dept. 2005) (noting that although contemporaneous
agreements should be read together, "it does not follow . . . that the arbitration clause in [one] agreement applies to all
disputes arising out of any of the documents related to this transaction"); *Fit Tech, Inc. v. Bally Total Fitness Holding
Corp.,* 374 F.3d 1, 10 (1st Cir. 2004) ("No one can seriously argue that clauses can be plucked at random from one
agreement and inserted into the other.")).

[56] 404 S.W.3d at 38 (emphasis added).

involving a separate contract.[57]  Although the two contracts were related, the court explained that "specific obligations assumed under one contract cannot be used to alter, amend or add to specific obligations assumed under the other contract."[58]

Here, contrary to the Defendants' arguments, the arbitration provision cannot be lifted from the Cayman Islands GIA and transferred to the Platinum/TKN Specific GIA simply because the provision is "broad."[59]  Although the agreements were executed simultaneously, they are two independent contracts, and Argonaut's rights under the Platinum/TKN Specific GIA can be fully considered without regard to the Cayman Islands GIA.[60]  Accordingly, Argonaut's claims are not subject to arbitration.

> b.   The Cayman Islands GIA does not require Argonaut to pursue arbitration.

Even if this Court were to extend the arbitration provision of the Cayman Island GIA to apply to disputes under the Platinum/TKN Specific GIA, that arbitration provision still would not compel Argonaut to arbitrate.  As the Fifth Circuit recognizes, "[w]ho is actually bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the agreement."[61]  "[N]o party is under a duty to arbitrate unless by clear language he has so agreed."[62]

---

[57] *Id.*

[58] *Id.* at 46-47 (citing *A.J. Robbins & Co.*, 610 S.W.2d at 856; *DeWitt Cnty. Elec. Co-op.*, 1 S.W.3d 96, 102 (Tex. 1999)).

[59] *See id.*; *Snyder*, 2011 WL 6382707, at *5.

[60] *See Speedemissions*, 404 S.W.3d at 46; *see also Snyder*, 2011 WL 6382707, at *5 n.68.

[61] *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355 (5th Cir. 2003).  In a recent decision, the Eleventh Circuit reversed itself and vacated an order requiring a surety to arbitrate its indemnity claims based upon an arbitration clause in the principal's subcontract.  *Hanover Ins. Co. v. Atlantis Drywall & Framing LLC*, 611 Fed.Appx. 585 (11th Cir. 2015).

[62] *Porter & Clements, L.L.P. v. Stone*, 935 S.W.2d 217, 220 (Tex. App.—Houston [1st Dist.] 1996) (emphasis added) (Texas law); *see also Rosenbaum v. Am. Sur. Co. of New York*, 183 N.E.2d 667, 668 (N.Y. 1962) ("There comes into play, therefore, the familiar rule that 'No one is under a duty to resort to arbitration unless by clear language he has so agreed.'") (quoting *Matter of Lehman v. Ostrovsky*, 190 N.E. 208, 209 (N.Y. 1934)) (New York law).

An agreement to arbitrate "will not be extended by construction or implication."[63]   Additionally, unilateral arbitration provisions are enforceable in both New York and Texas provided that the contract is supported by adequate consideration.[64]

Here, the clear language of the Cayman Islands GIA indicates that Argonaut did <u>not</u> agree to arbitrate any disputes under that agreement (or otherwise).  The Cayman Islands GIA, like the Platinum/TKN Specific GIA, was entered into "for the benefit of Argonaut" and imposes no affirmative obligations on Argonaut to do anything.[65]   While the Cayman Islands GIA does include an arbitration clause, that provision (like all the other provisions) is preceded by express language stating that "<u>Indemnitors hereby agree</u> . . . as follows . . . ."[66]  There is no reciprocal agreement to arbitrate by Argonaut.  In fact, Argonaut is not even a signatory to the Cayman Islands GIA.

For the avoidance of any doubt, the Cayman Islands GIA explicitly <u>prohibits</u> any interpretation that would limit any rights or remedies – such as the right to pursue legal action – which Argonaut would have otherwise had if the agreement had not been executed:

> 19.   **Non-waiver of Surety Rights.**   Nothing herein-contained shall be construed to waive or abridge any right or remedy which the Surety might have if this Agreement was not executed . . . .[67]

---

[63] *Rosenbaum*, 183 N.E.2d at 668 (quoting *Riverdale Fabrics Corp. v. Tillinghast-Stiles Co*., 118 N.E.2d 104, 105 (N.Y. 1954)).

[64] *See, e.g., In re FirstMerit Bank*, 52 S.W.3d 749, 757 (Tex. 2001) (Texas law); *Hafer v. Vanderbilt Mortgage and Finance, Inc.*, 793 F. Supp. 2d 987, 1007 (S.D. Tex. 2011) (Texas law); *Sablosky v. Gordon Company, Inc.*, 73 N.Y.2d 133, 137 (N.Y. 1989) (New York law).

[65] Exhibit C, p. 1.

[66] Exhibit C, p. 1 (emphasis added).

[67] Exhibit C, para. 19.

In a similar vein, the agreement also states that it is "in addition to and not in lieu of any other agreement relating to the obligations described herein."[68]

Consistent with Argonaut's interpretation of the arbitration provision, other sections of the Cayman Islands GIA contemplate that Argonaut would litigate – not arbitrate – any disputes. Specifically, the agreement includes the following language:

- *Para. 2* – Provides that the scope of the indemnity obligations include "the cost incurred [by Argonaut] in <u>bringing suit</u> to enforce this Agreement . . . ."[69]
- *Para. 21* – States that "[s]eparate <u>suits</u> may be brought hereunder as causes of action accrue, and <u>suit</u> mat be brought against any and all of the Indemnitors . . . ."[70]

The plain language of the Cayman Islands GIA, therefore, indicates that Argonaut did not agree to arbitrate any disputes with the Defendants. Absent "clear language" that Argonaut agreed to arbitrate, the Court has no authority to require arbitration of this dispute. The Defendants' motion to compel arbitration and stay these proceedings should be denied.

**3.      <u>Argonaut has stated a valid claim for breach of contract.</u>**

The Defendants' lone attack on the merits is not persuasive. They claim that the financial condition of Black Elk – the principal on the Bonds – is irrelevant in determining Argonaut's ability to invoke certain protections under the Platinum/TKN Specific GIA. This argument defies common sense and is directly contrary to the plain language of the agreement.

As noted above, paragraph 11 of the Platinum/TKN Specific GIA provides two independent bases for Argonaut to exercise – at its sole discretion – its right to demand a release

---

[68] Exhibit C, para. 16; *see also* para. 27 ("This Agreement is in addition to and not in lieu of any other obligations of Indemnitors in favor of Surety.").

[69] Exhibit C, para. 2 (emphasis added).

[70] Exhibit C, para. 21 (emphasis added); *see also* definition of "Losses," which includes "all costs and expenses incurred in connection with investigating, paying or <u>litigating</u> any claim under the Bonds . . . ." (emphasis added).

of the Bonds:

(a)    the Indemnitors financial condition has been or is believed to be deteriorating; **or**

(b)    there has been or is believed to be some other change that adversely impacts the Surety's risk under the Bond(s).[71]

The Defendants simply ignore the latter and rely instead on an overly restrictive interpretation of the former.

The Defendants' decision to ignore the second basis for invoking paragraph 11 is not surprising, as it would be difficult for them to seriously argue that bankruptcy by the principal does not constitute a "change that adversely impacts the Surety's risk under the Bond(s)."  Black Elk is facing a $660,606,223 claim by the primary beneficiary under the Bonds (the Department of the Interior), and it lacks the means to independently fund the necessary decommissioning activities to satisfy that claim.   As a result, the likelihood of an eventual call on the Bonds has increased dramatically, which undeniably "adversely impacts [Argonaut's] risk under the Bonds."  For that reason alone, Argonaut was well within its rights to demand that the Defendants release the Bonds or provide the necessary additional collateral.  It is hard to conceive of any other scenario, short of an outright bond call, for which the collateral demand provisions of the indemnity agreements would apply.

Additionally, despite the Defendants' argument to the contrary, the term "Indemnitors" as used in the Platinum/TKN Specific GIA does not exclude Black Elk.  Black Elk is an "Indemnitor"

---

[71] Exhibit B, para. 11 (emphasis added).  Texas courts consistently enforce provisions allowing one party to make a determination in its "sole discretion," with one court describing it as "an unlimited, unilateral right . . . ."  *Square D Co. v. H. of Power Elec., L.C.*, No. 09-3917, 2011 WL 6091805, at *7 (S.D. Tex. Dec. 7, 2011) ("In this case the [contract] expressly provides that '[t]his commitment may be rescinded or changed at [plaintiff's] sole discretion at any time without notice or cause.'  This language provided [plaintiff] an unlimited, unilateral right to change and/or rescind its commitment . . . without recourse for [the defendant].");  *see also Ditmann v. D.B. Zwirn & Co., L.P.*, No. 09-402, 2010 WL 519692 (S.D. Tex. Feb. 8, 2012); *U.S. v. Morejon*, 479 Fed.Appx. 595 (5th Cir. 2012); *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280 (Tex.App.—Dallas 2009).

under the Original GIA, and its "obligations and liabilities" under that agreement (including a

substantively identical paragraph 11) were assumed by the Defendants pursuant to the express

language of the Platinum/TKN Specific GIA:

> [The Defendants] hereby assume the obligations and liabilities of
> Black Elk Energy Offshore Operations, LLC, that Black Elk Energy
> Offshore Operations, LLC, as indemnitor, incurred as a result of the
> [Original GIA] including but not limited to all past, present and
> future obligations and liabilities under the bonds referenced herein
> under Exhibit A.[72]

Therefore, in addition to the bankruptcy's "adverse[] impact" on Argonaut's risk under the Bonds,

Black Elk's "deteriorating" financial condition provided an additional, independent basis for

Argonaut's demand under the Platinum/TKN Specific GIA for a release of the Bonds or for

additional collateral.

## <u>CONCLUSION</u>

For these reasons, the Court should deny the Defendants' motion in its entirety.

Respectfully Submitted,

**LOOPER GOODWINE P.C.**

*/s/ Paul J. Goodwine*
Paul J. Goodwine (La. Bar No. 23757)
Lindsey M. Johnson (La. Bar No. 34610)
650 Poydras Street, Suite 2400
New Orleans, Louisiana 70130
Telephone: (504) 503-1500
Facsimile:  (504) 503-1501
Email: pgoodwine@loopergoodwine.com
Email: ljohnson@loopergoodwine.com

*Attorneys for Argonaut Insurance Company*

---

[72] Exhibit B, para. 26.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of March, 2016, the above and foregoing document was transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

_/s/ Paul J. Goodwine_
Paul J. Goodwine